Filed 5/28/24  P. v. Pineda CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RAUL ALFARO PINEDA,<br><br>    Defendant and Appellant. | F084262<br><br>(Super. Ct. No. F19902728)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  F. Brian Alvarez, Judge.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Raul Alfaro Pineda had a fractious on-again/off-again and sometimes violent domestic relationship with M.D. that spanned several years.  After yet another heated verbal dispute, the final episode in that relationship culminated with Pineda seated

behind M.D. in the back seat of her car, reaching over, pulling her seat belt taut and her head back, and slashing her throat.  Fortunately, M.D. survived the attack.

A jury convicted Pineda of deliberate and premeditated attempted murder (Pen. Code,[1] §§ 664 & 187, subd. (a)), and found true enhancing allegations for personal infliction of great bodily injury during domestic violence (§ 12022.7, subd. (e)) and personal use of a dangerous and deadly weapon (§ 12022, subd. (b)(1)).  Pineda admitted he had previously suffered a prior conviction that was both a serious felony (§ 667, subd. (a)(1)) and a strike under the Three Strikes Law (§§ 667, subds. (b)–(i) & 1170.12, subds. (a)–(d)),[2] and further conceded two aggravating sentencing factor allegations were true (Cal. Rules of Court, rule 4.421(b)(2) and (b)(4)).  He was sentenced to an indeterminate term of 14 years to life on the attempted murder conviction and an 11–year determinate sentence for the enhancements and the prior conviction.[3]

Pineda appeals, contending:

(1)  He was denied his fundamental jury trial rights under the state and federal Constitutions when the trial court empaneled 14 jurors at the outset of trial and — after the evidentiary and closing argument phases of the trial were completed but before deliberations began — each party randomly selected one juror to become the alternates, while the remaining 12 jurors then retired to deliberate.  He further insists this procedure constituted structural error, required no showing of prejudice, and that the claim was neither waived nor forfeited for not being raised below.

---

[1] All undesignated statutory references are to the Penal Code.

[2] Pineda's prior conviction was for a less than one–year–old offense for dissuading a victim from reporting a crime (§ 136.1, subd. (b)(1)), and for which he was on probation. (See Fresno County Sup. Court case No. F18904322.)  Unsurprisingly, perhaps, the victim in that case was also M.D.

[3] The trial court also violated Pineda's probation on the prior conviction case and imposed an 8–month consecutive term.  That judgment has not been appealed.

2.

Alternatively, even if there was no constitutional error, Pineda argues that relegating two of the jurors to alternate status just prior to deliberations was statutorily erroneous, was prejudicial, and again the claim was neither waived nor forfeited by his failure to object.

(2) Lastly, Pineda contends that the trial court also prejudicially erred by refusing to give his requested voluntary intoxication jury instructions.

We affirm.

## DISCUSSION

Because Pineda raises two distinct appellate contentions, the first involving the pretrial jury empanelment procedures and the second a post-trial jury instruction claim, we separately outline the relevant factual and procedural backgrounds of each.

## I. THE 14-PERSON JURY PANEL

### A. Background

Before jury selection began, the trial court proposed a slight modification to the usual jury selection process:

> "Another thing that I've done, and *this is up to* [Pineda] *and the People because it's — it has to be mutually agreed upon*, is rather than picking alternates up front, what I've done on other cases is select 14 jurors and then at the conclusion of the evidence and before they retire to deliberate, we'll randomly select two of the 14 to be the alternates. I do that because I've found that it engages all jurors. In other words, if any of the alternates were seated up front, they may not be as inclined to listen to the evidence based upon a misbelief actually that they may never be called to actually have to deliberate with the other jurors. So, that's something that I've done, and it's worked out pretty well. *But I'll only do that if the parties are okay with that and agree to that*." (Italics added.)

After pretrial motions were completed, the court asked defense counsel whether she had consulted with Pineda regarding the 14–juror proposal, but she said she had not. The prosecutor asked, "The court is saying choose 14 and then decide at the end who the alternates are gonna be?" The court agreed and said the alternates would then be selected randomly: "Mr. Pineda will draw one number[ed] tile, the People will draw [an]other

number[ed] tile and those two will be alternate[s] A and B. Totally random." Defense counsel stated she would get back to the court about the proposal and the court advised her to "[p]lease discuss that further with Mr. Pineda so that way he has a — and *makes a voluntary and knowing choice*." (Italics added.)

Later, both parties agreed to the proposed 14–juror procedure. Specifically, defense counsel stated, "Your Honor, we would be accepting of that," and the prosecutor stated, "The People, likewise, agree." Although he was present at the hearing, Pineda did not personally agree, nor was he asked.

The trial court further clarified that it would allow 22 peremptory challenges for each party, instead of the usual 20 allotted in potential life–term cases such as the current case (see Code of Civ. Proc., §§ 231, subd. (a) & 234): "That way you're not deprived of any number of peremptories otherwise. So, *with the parties then in agreement of proceeding with 14 jurors*, you can use your peremptory challenges to the initial 14 members of the panel in the box." (Italics added.) No objections were lodged regarding this peremptory challenge arrangement.

Once voir dire was complete and 14 jurors had been accepted by the parties and were sworn, the trial court explained the plan to the jurors:

> "[R]ather than select the alternates up front, what we do is we select the alternates by random lot. We'll select two alternates at the conclusion of the evidence and before the jury is selected and retired to deliberate. We don't know who the alternates are gonna be, and you don't know who the alternates are gonna be. *The reason why I do this is that I find that it engages everybody in listening to the evidence. Everyone is going to be a juror deliberating, that's the mindset they should have. I have found that if people know they're going to be alternates, they may not be as inclined to want to listen to the evidence.* And so a couple of you won't be going back to retire to deliberate with the other 12. We don't know who those people are yet, but all times, you should expect that you will be deliberating back there, okay?" (Italics added.)

The court then proceeded with the preliminary jury instructions, and the jury was excused until the following day for the evidentiary phase of the trial to begin.

4.

Following the prosecution's case in chief, and after the defense rested without presenting any evidence, the jury was excused for a lunch break. The parties and the court discussed final jury instructions and then moved on to the selection of the two alternates:

> "THE COURT: All right. This is the time where we're going to select the alternates. And so each of the parties will randomly select one number[ed] tile out of the black bag and that number[ed] tile, that person selected will be the alternate. So, at this time, let's give it up to Mr. Pineda to make that first selection, please. Go ahead and mix those up if you will.
>
> "[Defense Counsel]: Can I explain to him what he's doing?
>
> "THE COURT: Sure. [Off the record discussion.] All right, you've had sufficient time to talk with your client?
>
> "[Defense Counsel]: I explained to him what he's doing, yes.
>
> "THE COURT: Very good. All right, he's picked out … 12. So [Juror] 12 will be alternate A. All right, and the People have an opportunity to select the next one. Four, Juror Four then will be alternate B."

When the 14 jurors returned from their break, the concluding jury instructions were given, and the parties made their closing arguments. After the court's final charge was given to the jury, 12 of them retired to begin deliberations, but jurors 4 and 12 were for the first time told to instead "remain here in the courtroom," where they were given the standard alternate juror instruction. (CALCRIM No. 3577.)

The deliberating 12–member jury returned with its verdicts the next morning and, as it turned out, the alternate jurors were never needed or used. Once more, Pineda made no objection to the verdicts, the composition of the jury, or the manner by which the convictions were reached.

Pineda now argues that even though he did not object to it — indeed, he agreed to it — this 14–juror procedure was nonetheless reversible error on two grounds, one constitutional and one statutory.

5.

## B. Analysis

### i. Waiver, Forfeiture, or Both

As the United States Supreme Court has explained: "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.' " (*United States v. Olano* (1993) 507 U.S. 725, 733 (*Olano*).) As discussed above, Pineda did not merely fail to object to the trial court's 14–juror procedure. Rather, when the court stated it would proceed only with Pineda's willing and voluntary choice, his defense counsel ultimately conceded that, "[W]e would be accepting of that." Moreover, when it became time to select the alternates at the close of trial and, after his counsel asked for time to explain to Pineda what he would be doing, Pineda then personally pulled out the numbered tile that would correspond to the first alternate juror.

Even assuming that this 14–juror procedure was technically erroneous in retrospect (see the discussion *post*), "[d]eviation from a legal rule is 'error' *unless* the rule has been waived." (*Olano, supra*, 507 U.S. at pp. 732–733, italics added.) Phrased differently, if a legal rule has been waived, deviation from that rule *is not error*. Therefore, any jury irregularity here was not trial error, and it provides Pineda no subsequent relief on appeal. (*People v. Visciotti* (1992) 2 Cal.4th 1, 38 (*Visciotti*).)

At the same time, " ' "[n]o procedural principle is more familiar … than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." ' " (*People v. Saunders* (1993) 5 Cal.4th 580, 590 (*Saunders*), quoting *Olano, supra,* 507 U.S. at p. 731.) Thus, having never raised an objection in the trial court, and despite having several opportunities to do so before and

after trial, Pineda's jury–composition claim at this point is not only waived but also *forfeited*.[4]

Instructive here is *People v. Mayfield* (1997) 14 Cal.4th 668 (*Mayfield*), overruled on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2. In that capital case, jury selection started by questioning each prospective juror individually regarding their death penalty views and then proceeded to the general voir dire stage where the parties exercised their peremptory challenges. During the death–qualification phase, the jurors were called in the alphabetical order of their last names. However, during the subsequent general voir dire, even though the jurors were still called randomly, for an unknown reason they all had last names beginning with the letters in the first half of the alphabet. (*Mayfield, supra,* 14 Cal.4th at p. 728.)

On appeal, the defendant contended this procedure violated his statutory right to random jury selection, created an opportunity for discrimination, and limited the exercise of his peremptory challenges in violation of his federal constitutional rights to due process of law and to an impartial jury. (*Mayfield, supra,* 14 Cal.4th at p. 728.) Our Supreme Court concluded that "[b]ecause the defense did not raise the present objection to the selection procedure before the jury was sworn, the claim ha[d] been forfeited." (*Ibid.*) Succinctly put, *"criminal convictions* [will] *not be overturned on the basis of irregularities in jury selection to which the defendant did not object or in which he has*

---

[4] Courts have sometimes conflated the terms "waiver" and "forfeiture," or even used other words, but the underlying principles have always been the same. (See, e.g., *United States v. Gagnon* (1985) 470 U.S. 522, 528–529 [right to be present at all stages of criminal trial "waived"]; *Segurola v. United States* (1927) 275 U.S. 106, 112 [alleged Fourth Amendment violation "was too late" if not raised before]; *People v. Hines* (1997) 15 Cal.4th 997, 1057 [objection to admission of evidence "bar[red]" by failure to object]; *People v. Turner* (1994) 8 Cal.4th 137, 177 [violation of Fourth Amendment based on delayed arraignment "waived"]; *People v. Wader* (1993) 5 Cal.4th 610, 635–636 [violation of Fifth and 14th Amendments due to admission of defendant's un-Mirandized statement "waived"]; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 583 [violation of right to fair trial due to visible restraints "waives the claim"].)

7.

*acquiesced.* [Citations.] The failure to object will therefore continue to constitute a waiver of a claim of error on appeal." (*Visciotti, supra,* 2 Cal. 4th at p. 38, italics added.) So too here.

We are aware that "[n]ot all claims of error are prohibited in the absence of a timely objection in the trial court. A defendant is not precluded from raising for the first time on appeal a claim asserting the deprivation of certain fundamental, constitutional rights." (*People v. Vera* (1997) 15 Cal.4th 269, 276; see *Saunders, supra*, 5 Cal.4th at p. 592 [plea of once in jeopardy]; *People v. Holmes* (1960) 54 Cal.2d 442, 443–44 [basic constitutional right to a jury trial].) As we explain more fully below, however, no such rights are at issue here.

Pineda argues that without his "personal and express waiver in open court," his counsel's representation that she had explained to him what would happen — and that "we" had accepted the 14–person procedure — and despite the fact Pineda himself selected alternate juror A, it was nonetheless an invalid waiver. He provides no direct authority for this supposed need for such an express personal waiver in this context, nor for how he did not forfeit the claim by failing to object to the procedure at several opportune moments before and after trial.

Instead, Pineda relies upon authorities where the waivers in question involved the more essential right to a jury trial itself or to the unanimous verdicts of all jurors. None, however, related to the *number* of the initial jurors in a pre-deliberation phase jury panel. Furthermore, and as we discuss below, Pineda *did* in fact receive a jury trial with the unanimous verdicts of all 12 of the ultimately empaneled jurors, and Pineda's cited authority is thus singularly inapt.

We therefore conclude that Pineda's jury composition claims were both waived by the defense's voluntary acceptance and acquiescence in the 14–juror procedure — including Pineda's personally participating in selecting the alternates — *and* forfeited by his failure to object either before, during, or after trial.

*ii. Even On the Merits the Claim Fails:* People v. Glenn

Waiver and forfeiture notwithstanding, Pineda candidly acknowledges that *People v. Glenn* (1990) 225 Cal.App.3d 618, review denied January 30, 1991, S018707 (*Glenn*), is "entirely on point," and that it appears to effectively defeat his jury–panel claim on the merits. Nonetheless, he attempts to persuade us to disregard it.

In *Glenn*, the trial court used a procedure almost identical to that used in the current case by seating an initial panel of 14 jurors with the two alternates chosen only at the end of the evidentiary phase of the trial. (*Glenn, supra,* 225 Cal.App.3d at p. 620.) Even though the appellate court rejected constitutional and statutory claims almost identical to those raised here, Pineda maintains that *Glenn* is distinguishable, if not wrongly decided. We are not convinced.

In *Glenn*, after voir dire was completed both parties accepted a panel of 14 jurors. Just as here, the trial court "explained that it intended to swear in all 14 and have them listen to the trial. Then, when the evidence had been presented, the clerk of the court was to randomly select the names of two of the fourteen, and those individuals would be designated the alternates and would not participate in deliberations unless one of the twelve had to be removed. The court stated its reasons for doing so was to ensure that the two people who were ultimately designated as alternates would pay as much attention to the trial as they would if they believed they were regular jurors. Neither defense counsel nor the prosecutor objected to this procedure or made any comment upon it whatsoever. At the close of evidence, when the clerk randomly selected two jurors to serve as alternates, the defense was once again silent." (*Glenn, supra*, 225 Cal.App.3d at p. 620.)

Just as here, for the first time on appeal Glenn "object[ed] to this procedure, claiming it violate[d] constitutional and statutory law and because of this, he [was]

9.

entitled to reversal of his conviction….” (*Glenn, supra*, 225 Cal.App.3d at p. 620.) However, the court disagreed.**5** (*Ibid.*)

As for his constitutional contention, “Glenn cite[d] article I, section 16, of the California Constitution, which provides for a jury of 12 persons to serve in criminal trials. In our view, a jury of 12 is precisely what Glenn got.  Although 14 people heard the evidence, the same occurs in any trial in which the alternates are selected at the time the regular panel is sworn.  Only 12 people deliberated here and decided Glenn’s fate.  He is entitled to nothing else under the [California] Constitution.” (*Glenn, supra*, 225 Cal.App.3d at pp. 620–621.)

Glenn’s statutory claim was based on section 1089.**6** “[He] argued that the trial court abused its discretion when the alternates were selected because they were ‘ “removed”

---

**5** Neither waiver nor forfeiture was ever raised or discussed in *Glenn*.

**6** Section 1089 provides in relevant part that: “Whenever, in the opinion of a judge of a superior court about to try a defendant against whom has been filed any indictment or information or complaint, the trial is likely to be a protracted one, the court may cause an entry to that effect to be made in the minutes of the court, and thereupon, immediately after the jury is impaneled and sworn, the court may direct the calling of one or more additional jurors, in its discretion, to be known as ‘alternate jurors.’ [¶] The alternate jurors must be drawn from the same source, and in the same manner, and have the same qualifications as the jurors already sworn, and be subject to the same examination and challenges, provided that the prosecution and the defendant shall each be entitled to as many peremptory challenges to the alternate jurors as there are alternate jurors called…. [¶] The alternate jurors shall be seated so as to have equal power and facilities for seeing and hearing the proceedings in the case, and shall take the same oath as the jurors already selected, and must attend at all times upon the trial of the cause in company with the other jurors, and for a failure so to do are liable to be punished for contempt. [¶] They shall obey the orders of and be bound by the admonition of the court, upon each adjournment of the court …. [¶] If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors.” (§ 1089.)

10.

from the jury without good cause.' [Citation.] Although it criticized the trial court's procedure and concluded that [section] 1089 was technically violated, the *Glenn* court upheld the defendant's conviction because he suffered no prejudice." (*People v. Cottle* (2006) 39 Cal.4th 246, 258, fn. 7, citing *Glenn, supra*, 225 Cal.App.3d at pp. 620–623.)

    a.  <u>Pineda's Constitutional Claims</u>

Even with *Glenn* to the contrary, Pineda first insists the 14–juror procedure in this case violated both his state and federal constitutional jury trial guarantees.

A criminal defendant has the constitutional right to be tried by a fair and impartial jury. (U.S. Const., Sixth & 14th Amends.; Cal. Const., art. I, § 16.) That right further requires a jury's unanimous verdict to support a conviction, whether in federal or state courts. (*Ramos v. Louisiana* (2020) 590 U.S.__, __ [140 S.Ct. 1390, 1397] (*Ramos*); *People v. Anzalone* (2013) 56 Cal.4th 545, 551.)

Under the California Constitution, in "criminal actions in which a felony is charged, the jury shall consist of 12 persons." (Cal. Const., art I, § 16; see also Code of Civ. Proc, §§ 220 & 192; *People v. Traugott* (2010) 184 Cal.App.4th 492, 500, 504 [denial of the right to a unanimous 12–person verdict constitutes a structural defect that, by its nature, results in a miscarriage of justice].)

Nonetheless, *Glenn* resolved the state constitutional claim in a manner we find fully applicable here: "[A]rticle I, section 16, of the California Constitution … provides for a jury of 12 persons to serve in criminal trials," and "a jury of 12 is precisely what [Pineda] got. Although 14 people heard the evidence, the same occurs in any trial in

---

Code of Civil Procedure section 234 includes almost identical language but refers more generally to the trial of "a civil action or criminal action or proceeding," and to the peremptory challenges outlined in Code of Civil Procedure section 231. For the purposes of our discussion, however, the differences between these statutes are not relevant, because it was equally contrary to both to select 14 jurors *at the outset* and only select the alternates just prior to deliberation; statutorily, alternate jurors should normally be separately selected and sworn immediately after a jury of 12 is empaneled and sworn.

which the alternates are selected at the time the regular panel is sworn. Only 12 people deliberated here and decided [Pineda's] fate. He is entitled to nothing else under the [California] Constitution." (*Glenn, supra*, 225 Cal.App.3d at pp. 620–621.)

Pineda argues *Glenn* is distinguishable on state constitutional grounds because in *Glenn* the alternates were selected at the close of evidence, but not after argument and instructions as in the current case. Not only is this a distinction without a difference, Pineda does not explain how he was thereby unconstitutionally denied the unanimous verdicts of the 12 jurors empaneled to decide his case as he asserts. The applicability of *Glenn* is constitutionally unaffected by this temporal procedural difference and Pineda offers no authority to suggest otherwise.

Furthermore, Pineda's argument proves too much because it would obviate the use of *any* alternate jurors after the evidentiary phase but before argument and instructions — even including during deliberations — because, as Pineda puts it, the ultimate "12 jurors who would actually deliberate defendant's fate did not know their status as trial jurors," before the instructions and closing arguments. This, of course, is not the law. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 440 [substitution of an alternate even after court had accepted verdicts on two charges was not error]; *People v. Collins* (1976) 17 Cal.3d 687, 693, limited by statute on another ground in *People v. Fields* (1983) 35 Cal.3d 329, 351, fn. 9 ["the right to trial by jury does not require a declaration of a mistrial when a properly qualified alternate juror is available, and that juror fully participates in all of the deliberations which lead to a verdict"].)

Pineda also attempts to distinguish *Glenn* because in that case no federal constitutional claim was raised or considered. While this is true, it does not affect our resolution of the claim because the federal Constitution is of even less assistance.

To convince us otherwise, Pineda cites inapposite United States Supreme Court authority regarding the Sixth and 14th Amendment's right to a jury trial and a unanimous jury verdict in criminal cases. Pineda focuses on *Ramos, supra,* where the high court

held that "if the Sixth Amendment's right to a jury trial requires a unanimous verdict to support a conviction in federal court, it requires no less in state court." (*Ramos, supra,* 590 U.S. at p. __ [140 S.Ct. at p. 1397].)  However, *Ramos* is a unanimity case, not a 12–person jury case as Pineda implies.

Likewise, Pineda's reference to *United States v. Gaudin* (1995) 515 U.S. 506 (*Gaudin*) is also misplaced because it too is a unanimity case that addressed whether a jury must unanimously determine whether a defendant is guilty of every element of a crime.  *Gaudin* had nothing to do with the numerical makeup of the jury.  (*Id.* at pp. 522–523.)

In fact, Pineda's references to *Gaudin* and *Ramos* are taken completely out of context in his attempt to assert his 12–person jury argument.  In reality, under the Sixth and 14th Amendments, juries need *not* be composed of 12–person panels.  (*Williams v. Florida* (1970) 399 U.S. 78, 86 [a six–person jury in a state criminal trial did not violate either the Sixth or 14th Amendments].)  "[T]he fact that the jury at common law was composed of precisely 12 is a historical accident, unnecessary to effect the purposes of the jury system and wholly without significance 'except to mystics.'  [Citation.]  To read the Sixth Amendment as forever codifying a feature so incidental to the real purpose of the Amendment is to ascribe a blind formalism to the Framers which would require considerably more evidence than we have been able to discover in the history and language of the Constitution or in the reasoning of our past decisions." (*Williams v. Florida, supra,* 399 U.S. at p. 102; but see *Ballew v. Georgia* (1978) 435 U.S. 223, 245 [Sixth and 14th Amendments' right to trial by jury were violated by a *five*–person jury in a criminal case, thus drawing a line at six jurors].)  Under the Sixth Amendment, therefore, although six jurors may be the floor, 12 jurors is not the ceiling.

Indeed, had Pineda accurately cited *Gaudin*, he would have had to acknowledge that it clearly states that "the 12–person requirement … is *not* an indispensable component of the right to trial by jury." (*Gaudin, supra,* 515 U.S. at p. 510, fn. 2, italics

13.

added.)  Instead, it is a common law artifact that, while sometimes preserved in state law as in California, has no Sixth Amendment foundation.  Indeed, *Gaudin* directly cited *Williams v. Florida* on this exact point (*Gaudin, supra,* 515 U.S. at p. 510, fn. 2), but Pineda's appellate counsel seems to have either not noticed or did not believe it would be worth mentioning to us with regard to his 12–person jury contention.

Rather, appellate counsel cites *Ramos, supra,* as holding that the "Sixth Amendment require[s] [a] jury verdict of 'twelve persons' " and *Gaudin, supra*, as saying that there is a "constitutionally guaranteed [right to a] trial by [a] jury of twelve persons." Neither assertion is true, nor even arguably implied by those two cases, especially when *Williams v. Florida, supra,* unequivocally holds otherwise.

More fundamentally, the federal Constitution guarantees a unanimous jury verdict on all elements and allegations and, as the *Glenn* court pointed out when analyzing the procedure used in that case in its discussion of the California Constitution, this is exactly what Pineda received here: unanimous verdicts on all charges and allegations from a 12–person jury.  Pineda's state and federal constitutional challenges to the 14–person pre-deliberation jury procedure which the defense agreed to and participated in, are therefore without merit.

b.  Pineda's Statutory Claims

Although they were both waived and forfeited below, Pineda's statutory–based objections to the trial court's 14–juror procedure also fail on the merits.

As was the case in *Glenn,* we first find that despite the statutory irregularities, Pineda has failed to show how he was prejudiced by the fact that the two never-used alternates had not been identified as such until before deliberations began.  (See *Glenn, supra*, 225 Cal.App.3d at pp. 620–623.)  Thus, even assuming that section 1089 and the similar Code of Civil Procedure sections were violated — and even though "[d]eviation from a legal rule is 'error' unless the rule has been waived" (*Olano, supra*, 507 U.S. at pp. 732–733) — Pineda has not shown prejudice.

14.

Pineda speculates, without any evidentiary basis or legal support, that there was "a reasonable chance, more than an abstract possibility, … that a hung jury would have occurred if jurors 4 and/or 12 were not erroneously discharged as deliberating jurors." First, jurors 4 and 12 were not "discharged," they were selected as alternates and retained for possible use, and Pineda's inapplicable case authority involving discharged jurors is irrelevant. Second, Pineda provides no factual basis for claiming that had either of the two alternate jurors been members of the final 12, there would have been a "reasonable chance" for a hung jury. (Cf. *People v. Henderson* (2022) 78 Cal.App.5th 530, 566–567 [defendant could not show prejudice from discharge of juror before deliberations, since there was no evidence the juror was leaning one way or the other on the question of the defendant's guilt].)

We also note that the reason for the *Glenn* court's disapproval in dicta of the 14–juror procedure used in that case was premised on four factors: (1) it technically violated section 1089; (2) it necessitated overly–extreme care by the trial court to assure counsel received the proper number of peremptory challenges; (3) unless defense counsel is warned in advance, he or she may not take the opportunity to question prospective jurors about their willingness to serve as alternates; and (4) there was no "empirical evidence" establishing that alternate jurors do not pay attention during trial. (*Glenn, supra,* 225 Cal.App.3d at pp. 622–623.)

None of these factors prejudicially affected the current case. Although section 1089 technically was violated, unlike in *Glenn* the irregularity here was fully agreed–to in advance, i.e., it was waived and therefore not legal error. (*Olano, supra*, 507 U.S. at pp. 732–733.) Indeed, the trial court was very careful to make sure that Pineda and his counsel agreed to the procedure: "[T]his is up to [Pineda] and the People because it's — it has to be mutually agreed upon;" "I'll only do that if the parties are okay with that and agree to that;" "Please discuss that further with Mr. Pineda so that way he has a — and makes a voluntary and knowing choice."

15.

Similarly, the trial court here also ensured that the number of peremptory challenges was properly adjusted for a 14–juror panel, and that the parties were made aware of that fact before voir dire ever commenced.  Finally, as for the lack of "empirical evidence" that alternate jurors do not pay as close attention during trial, here an experienced trial court judge expressly relied on his own experiences and observations in support of his suggested approach.[7]

The four factors the *Glenn* court found problematic were either non-existent or explicitly mitigated in the current case, thereby further reinforcing our conclusion that just as in *Glenn* itself, there was no demonstrable prejudice here.

Pineda received a jury of 12, as required by article I, section 16 of the California Constitution, and he received the unanimous verdicts of those same 12 jurors as mandated by both the California and federal Constitutions.  Accordingly, no constitutional violation occurred.

Similarly, although the trial court's jury selection procedure was not strictly in line with section 1089, Pineda voluntarily agreed to it and therefore has no grounds to complain on appeal.  (*Visciotti, supra,* 2 Cal.4th at pp. 36–38.)  Moreover, even assuming it was statutory error, Pineda has not shown and cannot show prejudice. The trial court gave counsel advance notice of the procedure and allowed extra peremptory challenges to compensate for the selection of the two additional jurors.  Moreover, the record does not suggest that any of the 14 jurors who heard the case paid less attention or took his or her

---

[7] "I've found that [the 14–juror procedure] engages all jurors.  In other words, if any of the alternates were seated up front, they may not be as inclined to listen to the evidence based upon a misbelief actually that they may never be called to actually have to deliberate with the other jurors.  So, that's something that I've done and it's worked out pretty well."  "The reason why I do this is that I find that it engages everybody in listening to the evidence.  Everyone is going to be a juror deliberating, that's the mindset they should have.  I have found that if people know they're going to be alternates, they may not be as inclined to want to listen to the evidence."

role less seriously than had the alternates been selected at the outset of trial, as required by section 1089.

## II. THE VOLUNTARY INTOXICATION INSTRUCTIONS REQUEST

Pineda next contends that the trial court's refusal to give his requested jury instructions on voluntary intoxication was prejudicial error and his conviction should be reversed. To give context to this claim, and because a substantial evidence inquiry is involved, we recite the underlying facts. We do so as we must in the light most favorable to the judgment. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.)

### A. Factual Background

#### i. The Trial Evidence

Beginning in 2015, Pineda and M.D. had a sporadic relationship, although they never lived together nor had children. It began well, but by 2018 there were problems. M.D. said that when Pineda was sober, he was kind and a good person. However, when he drank, he would become jealous. In June 2018, M.D. was still occasionally seeing Pineda, but they "weren't doing too well," and she had stopped dating him because of his drinking.

M.D. and Pineda both worked at a facility packing corn and between 1:30 and 2:00 a.m. one morning she got into the van that picked her up and took her to work in the fields and discovered Pineda was inside. This surprised her because he had been missing a lot of work at the time.

Once at work, they both got on the same machine. Pineda asked M.D. why she had not come to his house the previous day. She said she would not be going to his house again until she saw a change in him, and until they "could talk like two civilized people who were in their right minds without any liquor inside of them." Pineda was angered by this and hit her in the eye with a closed fist, resulting in a black eye. He also picked up a knife, put the handle to her stomach, and said, " 'Do you want me to kill you?' " Other people present began to intercede, and Pineda jumped off the machine and fled.

17.

According to M.D., Pineda ended up being "incarcerated" after this episode, and went to a "program." She thought that "things would change after the program," but "nothing changed, just the opposite."[8]

In April 2019, M.D. started to see Pineda's behavior becoming similar to that in 2018. He had been calling her a lot, and was demanding and jealous. On April 24, Pineda called her about six times, some of which she answered, others she ignored. When she did answer, he said he wanted her to come over to his house; he wanted to fix things so they could continue their relationship. M.D. had earlier told him that if he did not change, their relationship would be over.

Later that day, M.D. finally drove over to Pineda's house because she did not want him calling her so often, and she parked in front of his house. Pineda came out, wearing a white shirt and jeans. He came up to the driver's side window and M.D. rolled down her window. He was holding a beer, so she knew he had been drinking, although she did not know how much. He appeared to her as upset, "because he had been drinking."

Pineda asked her if she still loved him and if she could give him an opportunity to change. She told him that "as long as he did not stop drinking" and "thinking bad things about [her] that the things between us were not going to work." She said Pineda "promised [her] that he was going to change. But he never changed." She told him she did not believe him.

Finally, M.D. told Pineda that she wanted to end the argument and she wanted to go home, but he insisted she stay so he could talk to her. Pineda became angry and wanted her to come into the house to "calmly talk about our issues and fix" them, but M.D. would not agree.

---

[8] Although the record does not include all the details, the parties stipulated at trial that Pineda's prior conviction for dissuading a victim from reporting a crime arose from this June 2018 incident, that the victim was M.D., and that Pineda was convicted in October 2018. The current offense was committed six months later.

M.D. said she did not ever see a weapon in Pineda's hands. She added that he was not "saying anything bizarre or off topic," and that he responded "appropriately to the conversation." He was not "falling over or anything like that."

Pineda asked her if he could instead get in the car and sit in the backseat behind her. She agreed. When he got in and closed the door, she looked at him through the rearview mirror because she did not "feel calm" with him sitting back there. Pineda again kept asking her to go into his house so they could talk, but she continued to refuse. They started arguing again about their relationship.

Suddenly, Pineda pulled her seatbelt back with his hand, and pushed her chin up, causing her head to go back into the headrest, thus exposing her neck. He said nothing. She struggled to get away from where she was sitting, but she was held back by her seatbelt. Although it happened very quickly, M.D. said she was cut across the neck and throat area. She only realized it when she saw blood because she did not initially feel any pain. Pineda then got out of the car and "took off running" down the street.

M.D. was able to get out of her car on her own, went into the house — where Pineda's sisters also lived — where someone called 911, and police and paramedics soon responded. Pineda did not return.

Several hours later, police received an anonymous call that Pineda was at a house seven or eight blocks away. When they arrived, a man who said he was Pineda's uncle led them into the house where Pineda was found hiding under a bed and now wearing a *purple* shirt and jeans.

The arresting sergeant said he saw no indication Pineda was confused, did not see Pineda stumble or fall while walking to the patrol car; he did not observe any objective signs of intoxication, and said Pineda appeared to understand the commands and directions given to him.

While being transported to jail, Pineda asked why he was being arrested. He was told they could talk later, but Pineda replied, " 'She's been threatening me,' " and "that if

19.

he didn't get a chance to talk to somebody at the police department, he was gonna tell everything to the judge."

At the police station and after processing, Pineda asked to give a statement. The sergeant interviewing Pineda again said he did not notice any objective signs of intoxication or feel that Pineda "was under the influence" during an interview that lasted about 30 minutes.

Pineda told the sergeant that he got into an argument with M.D., and she told him that if he did not get back with her, she would get people to beat him up. He initially said that he became angry and did not recall what happened after that, but insisted he fled because he was scared and did not want to be arrested. He later added to his story by stating that he became angry because M.D. had threatened him, he hit her, and then fled because he feared being arrested. He claimed not to remember whether he had hit M.D. with a weapon or his hands, or with which hand he struck her.

At some point, the sergeant told Pineda that M.D. had been stabbed, apparently implying that there would have been blood present. When he asked Pineda why he had changed shirts, Pineda said he was "walking" and "got hot, so he took off his white shirt," although he could not remember where he left it, and somehow "found" the purple shirt and put it on.

The sergeant asked Pineda where the knife was, but Pineda could not remember where he left the knife, suggesting "it must have fallen out." Notably, Pineda did not deny there had been a knife involved and, in fact, at one point he admitted he had "gotten it from the kitchen." Pineda did not say he was drunk at the time, only that he was hungover and could not remember some things because he was hungover.

During his entire encounter with Pineda that day, the sergeant said he did not see Pineda vomit, stumble, or act incoherently, and that Pineda did not ever appear to be drunk or under the influence of any drug. Consequently, he did not ask Pineda about when, what, or how much he had imbibed.

20.

Pineda did not testify, and the defense rested without presenting any evidence — intoxication–related or otherwise.[9]

*ii. The Jury Instruction Requests*

At the jury instruction conference, the trial court noted that the defense had requested instructions on voluntary intoxication (CALCRIM Nos. 625 and 3426). Defense counsel told the court:

> "[W]e would contend that there is sufficient evidence that it should go to the jury to decide whether the alcohol level that — or amount that Mr. Pineda took that day, inebriated [*sic*] that day was sufficient to negate [the specific intent requirement for attempted murder]. Specifically, we would contend that [M.D.'s] testimony of [Pineda] having the beer bottle when he went over to talk to [M.D.] while he's arguing with her, the testimony of [M.D.] that she knows when he's been drinking … he's very argumentative, he's very jealous, he won't stop calling her repeatedly. … [The sergeant] didn't inquire as to how much [Pineda] had drank [*sic*] or any of those things, so those details were never made available through the officer. And Mr. Pineda does have a right to remain silent as he's doing, but we would contend nonetheless … [M.D's testimony] … is the main testimony really other than the [sergeant's]…. [W]e would contend that it's for the jury to decide if the amount of alcohol he had taken rises to the level of impairing his ability to have a specific intent to kill [M.D.]. That is a jury decision and we would contend that there is enough evidence [to go to the jury]."

In response to the People's rejoinder that the evidence of intoxication was insufficient to warrant the jury instructions, defense counsel concluded by stating that "clearly [Pineda] had some alcohol in him," and although "[h]ow much is unknown and whether the amount he drank is sufficient to negate this specific intent … is for the jury to decide and not to be usurped from them."

The court refused the requested instructions:

---

[9] At a pretrial suppression motion hearing, Pineda testified that he did not recall much about the day of the incident because he "was really drunk" at the time. He also claimed he could not remember things very well because he had also snorted crystal methamphetamine. However, as the trial court pointed out during the jury instruction conference, none of that evidence was presented at trial.

"I do note that Mr. Pineda is relying — appears to be relying on the voluntary intoxication defense.  However, there is not substantial evidence to support giving it, in the Court's estimation….  Substantial evidence means evidence of a defense that, if believed by the jury, would be sufficient to raise a reasonable doubt as to the Defendant's guilt.  And here, *there was no evidence of voluntary intoxication. There was evidence of drinking, no doubt, alcohol consumption.*  And, in fact there was evidence that problems in the relationship between Defendant and [M.D.] were caused by his alcohol consumption or his drinking.  But, here, there was no evidence that he was voluntarily intoxicated.  True, he did have a beer in hand when he met [M.D.] on the date of the alleged incident.  True, he did tell [the sergeant] several hours later that he was hungover, but *there's no evidence to show that he was voluntarily intoxicated particularly on that day*.  The Court also notes that there was some testimony by [M.D.] that his conduct on this date … was consistent with his drinking, that is he was — he was incessantly calling her apparently or texting her in a way that led her to think that he had been drinking. But at the same time, there was no evidence about his intoxication and that's the distinction for the Court.  Certainly, had there been some evidence about his intoxication, you know, substantial evidence of his intoxication, that would be essentially slurred speech, maybe his gait was, uh — or his walk was crooked, maybe he had other objective symptoms of showing intoxication that would support giving this instruction, the Court would be inclined to give this instruction. And the Court does not lightly decline this instruction.  It's just there's no substantial evidence from the Court's viewpoint to warrant giving this instruction. True, again, *there's evidence that he was drinking, but the Court does not believe that it's substantial evidence of voluntary intoxication.*  So, for that reason, the Court's going to decline to give the requested [instructions]."  (Italics added.)

## B.  Legal Background

"No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition.  Evidence of voluntary intoxication shall not be admitted to negate the *capacity* to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act."  (§ 29.4, subd. (a), italics added.)  Rather, "[e]vidence of voluntary intoxication is admissible *solely* on the issue of whether or not the defendant *actually* formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought."  (*Id.,* subd. (b), italics added.)  The potentially

22.

mitigating effects of voluntary intoxication on mens rea equally apply to both attempted murder and murder.  (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016.)

In general, " 'a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' " (*People v. Thomas* (2023) 14 Cal.5th 327, 385; *People v. Brooks* (2017) 3 Cal.5th 1, 73.) This may include providing, upon request, "legally correct and factually warranted pinpoint instructions designed to elaborate and clarify other instructions …."  (*People v. Hughes* (2002) 27 Cal.4th 287, 362 (*Hughes*).)  When considering whether to give a specific pinpoint instruction, the trial court should consider whether the instruction incorrectly states the law, is argumentative, duplicative, potentially confusing, *or is not supported by substantial evidence*.  (*People v. Moon* (2005) 37 Cal.4th 1, 30, 32.)  In other words, "[a] trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39–40.)

"Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact that … is however predominantly legal. As such, it should be examined without deference."  (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Quarles* (2018) 25 Cal.App.5th 631, 634 ["We review a trial court's refusal to give a requested instruction de novo."].)  Even so, "the trial court's view of the strength of the evidence of intoxication is entitled to some weight on appeal."  (*People v. Ramirez* (1990) 50 Cal.3d 1157, 1181, fn. 12.)

A trial court has no sua sponte duty to instruct on voluntary intoxication and "it makes more sense to place on the defendant the duty to request an instruction which relates the evidence of his intoxication to an element of a crime, such as premeditation and deliberation."  (*People v. Saille* (1991) 54 Cal.3d 1103, 1120; *Hughes, supra,* 27 Cal.4th at p. 342 ["[T]he trial court has no sua sponte duty to instruct that voluntary

intoxication may be considered in determining the existence of premeditation and deliberation."]; *People v. Suazo* (2023) 95 Cal.App.5th 681, 694, fn. 4 (*Suazo*).)

Moreover, "[t]he mere fact that a defendant may have been drinking prior to the commission of a crime does not establish intoxication or require the giving of a requested instruction thereon." (*People v. Miller* (1962) 57 Cal.2d 821, 830–831; see *People v. Spencer* (1963) 60 Cal.2d 64, 87–88 [no instruction even though defendant had drunk beer and whisky and testified he was " ' pretty well plastered' "].)

Crucially, a defendant is only entitled to a jury instruction on voluntary intoxication when there is substantial evidence *both* that the defendant was voluntarily intoxicated *and* that his intoxication "affected [his] 'actual formation of specific intent.' " (*People v. Williams* (1997) 16 Cal.4th 635, 677; *People v. Verdugo* (2010) 50 Cal.4th 263, 295.) Simply put, "evidence of voluntary intoxication without evidence of its effect on a defendant's ability to formulate specific intent is insufficient to establish the defense," or to warrant special instructions. (*People v. Serrano* (2022) 77 Cal.App.5th 902, 918, citing *People v. Williams, supra*, 16 Cal.4th at pp. 677–678.)

In other words, "an intoxication instruction is not required when the evidence shows that a defendant ingested drugs or was drinking, unless the evidence *also shows* he became intoxicated to the point he failed to form the requisite intent or attain the requisite mental state." (*People v. Ivans* (1992) 2 Cal.App.4th 1654, 1661, italics added.) The second prong of this two–part test is especially essential here.

**C. Analysis**

The only evidence of Pineda's intoxication on the day of the offense was M.D.'s testimony that she suspected he had been drinking because he held a beer in his hand when he approached her car, and that in the past he became jealous only when he drank, rather than the good person he normally was when sober. As well, M.D. did opine her throat was slashed because Pineda "wasn't, um, in his right mind" and was "engaged in bad behavior with the drugs."

However, this is far from evidence of an intoxication so substantial as to negate the appropriate mens rea.  Indeed, if anything, it instead suggests how and why it was that Pineda may have formed and entertained those mental states.  More to the point, M.D. did not know how much Pineda had to drink that day, she said he appeared to respond appropriately during their extended conversation, and was not staggering or unable to stand.  Similarly, when Pineda was detained, the police sergeant — an officer trained to spot objective signs of intoxication — did not see any, and did not see Pineda stumble or fall, have trouble speaking, or exhibit any signs of confusion.  Any actual evidence of intoxication itself, therefore, was at best scant and certainly not substantial.

As for the second component of the substantial evidence test, even assuming there was *some* minimal evidence that Pineda was voluntarily intoxicated during his attempt to kill M.D., there was *no* evidence whatsoever adduced at trial to demonstrate how that supposed intoxication *actually* resulted in Pineda's inability to formulate the specific mental states necessary to establish deliberate and premeditated attempted murder.  (Cf. *People v. Olivas* (2016) 248 Cal.App.4th 758, 772.)  His *past* behavior when drinking, even assuming it was marginally relevant in the current case (see Evid. Code, § 1101, subd. (b)), could perhaps once been indicative of a diminished *capacity*, but that is no longer a defense in this state.  (See *Suazo, supra,* 95 Cal.App.5th at p. 697; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1125.)[10]

More importantly, and contrary to Pineda's contentions here, the substantial evidence in this case actually points to a specific intent to kill M.D. after deliberated premeditation.

---

[10] At one point in his briefing, Pineda cites *Pirtle v. Morgan* (9th Cir. 2002) 313 F.3d 1160, but that case was decided under the aegis of Washington state law, where the diminished capacity defense still existed at the time.  (*Id.* at pp. 1169–1170.)  It is therefore of no import here.

In the June 2018 incident, M.D. had told Pineda she would no longer go to his house until he changed his behavior. Pineda was so angered by this that he punched her in the eye, picked up a knife, put it to her stomach, and said, " 'Do you want me to kill you?' " The seeds of an intent to kill were thus planted long before the ultimate 2019 attack. Pineda's resulting conviction for trying to intimidate M.D. from reporting that offense to the authorities may have only further nurtured those same seeds by adding to his festering anger. Moreover, nothing from the 2018 altercation suggests Pineda had been drinking at the time — they were at work — let alone intoxicated; his anger, resort to violence against M.D. and, most importantly, his expressions of a murderous intent were thus not limited only to when he was drinking.

By 2019, M.D. once more tried to rebuff Pineda's repeated attempts to reconcile until she finally agreed to go to see him as a way to stop him from harassing her. On the day of the current incident, when M.D. arrived, Pineda had apparently concealed his knife as he approached M.D.'s car, because M.D. said she did not see it. Why would someone carry a knife in the first place — and hide it — when he went out to greet the woman he was hoping to reconcile with?

Pineda repeatedly insisted they go inside the house, where none of the neighbors would be able to see what was happening, but when that failed, he sat *behind* M.D. in her car — not in the passenger seat — thereby giving himself a more opportune tactical advantage. Similarly, his attack was not some random drunken flailing; he grabbed M.D.'s seatbelt taut, and pulled her chin back, immobilizing and exposing her most–vulnerable throat. Afterwards, his behavior showed rational decision–making and an unclouded consciousness of guilt — not the supposed mentally disabling effects of voluntary intoxication — because he fled, changed his shirt, and hid under a bed at his uncle's house.

Simply put, none of the evidence in this case established substantial evidence of intoxication itself, let alone substantial evidence of intoxication sufficient to negate the

requisite mental states that would have required a court to give the requested voluntary intoxication instructions.  The trial court therefore did not err in refusing to give them.[11]

## DISPOSITION

The judgment is affirmed.


SNAUFFER, J.

WE CONCUR:


FRANSON, Acting P. J.


MEEHAN, J.

---

[11] For the first time on appeal, Pineda tries to cast the trial court's refusal to instruct on voluntary intoxication in constitutional terms, contending it denied him his 14th Amendment due process rights, and string-cites a host of generic federal cases in support.  First, his failure to raise this constitutional claim in the trial court forfeits the contention on appeal.  (*In re Sheena K.* (2007) 40 Cal.4th 875, 880–881; *Olano, supra*, 507 U.S. at p. 731.)

Moreover, forfeiture notwithstanding, "[n]o separate constitutional discussion is required … when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time [on appeal]."  (*People v. Scott* (2011) 52 Cal.4th 452, 487, fn. 29; *People v. Scott* (2015) 61 Cal.4th 363, 394–395 ["Rejection of a claim on its merits necessarily disposes of the additional constitutional 'gloss'."]; accord, *People v. Wallace* (2008) 44 Cal.4th 1032, 1050, fn. 4.) ["No separate constitutional discussion is required in such cases, and we therefore provide none."].) Because we have fully resolved Pineda's jury instruction claim against him on the merits, we also reject his newly divined constitutional claim.

27.